IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PERDUE FARMS INCORPORATED
   31149 Old Ocean City Road
   Salisbury, Maryland 21804

       Plaintiff,

STONE CONTAINER CORPORATION
   150 N. Michigan Avenue
   Chicago, Illinois 60601

AND

JEFFERSON SMURFIT CORP
   8182 Maryland Avenue
   Saint Louis, Missouri 63105

SMURFIT STONE CONTAINER CORP.
   150 N. Michigan Avenue
   Chicago, Illinois 60601

AND

INTERNATIONAL PAPER CO.
   Two Manhattanville Road
   Purchase, New York 10577

GEORGIA-PACIFIC CORP.
   133 Peachtree Street N.E.
   Atlanta, Georgia 30303

AND

WEYERHAEUSER CO.
   33663 Weyerhauser Way South
   Federal Way, Washington 98001

Civil Action No.

WMN 03 CV 1702

TEMPLE-INLAND INC.
    1300 Mopac Expressway South
    Austin, Texas 78746


GAYLORD CONTAINER CORP.
    500 Lake Cook Road, Suite 400
    Deerfield, Illinois 60015

AND

UNION CAMP CORP.
    1600 Valley Road
    Wayne, New Jersey 07470


SIMPSON TACOMA KRAFT CO.
    801 Portland Avenue
    Tacoma, Washington 98421


TENNECO, INC.
    1900 West Field Court
    Lake Forest, Illinois 60045


TENNECO PACKAGING, INC.
    1900 West Field Court
    Lake Forest, Illinois 60045

AND

PACKAGING CORPORATION OF AMERICA
    1900 West Field Court
    Lake Forest, Illinois 60045

                        Defendants.

## COMPLAINT

Plaintiff Perdue Farms Incorporated ("Perdue") brings this action for treble damages and injunctive relief, as well as attorneys' fees and costs, under the antitrust laws of the United States and the Maryland Antitrust Act.

## JURISDICTION AND VENUE

1. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Md. Code Ann., Com. Law II § 11-209, for treble damages and for injunctive relief, including reasonable attorneys' fees, for the injuries sustained by Plaintiff arising from Defendants' violations of Section One of the Sherman Act, 15 U.S.C. § 1, and the Maryland Antitrust Act, Md. Code Ann., Com. Law II § 11-204.

2. This action is also instituted to secure injunctive relief against Defendants to prevent further violations of Section One of the Sherman Antitrust Act and of the Maryland Antitrust Act as hereinafter alleged.

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26.

4. Venue in this District is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391. The combination and conspiracy charged in this Complaint was carried out in substantial part within this District. Defendants are found or transact business within this District, and the interstate trade and commerce described in this Complaint was carried out in substantial part within this District.

## DEFINITIONS

As used herein, the following terms have the meanings set forth below:

a.  "Relevant Period" means the period October 1, 1993, through at least November 30, 1995.

b.  "Corrugated container" means any container constructed with a fluted sheet known as corrugating medium pasted between sheets of linerboard.

c.  "Linerboard" includes any grade of paperboard suitable for use in the production of corrugated containers, but excludes corrugating medium.

d.  "Person" means any individual, partnership, corporation or other business or legal entity.

## PLAINTIFF

6.  Plaintiff Perdue is a privately held corporation headquartered at 31149 Old Ocean City Road, Salisbury, MD 21804. Perdue purchased substantial quantities of corrugated containers from one or more of the Defendants during the Relevant Period. In January 1995, Perdue purchased 100% of the stock of Showell Farms, Inc. ("Showell"). In October, 1998, Perdue purchased all of the business assets of Advantage Foods, L.L.C. ("Advantage Foods"), including all of Advantage Foods' claims against Defendants. In October 1999, Perdue acquired 100% of the stock of Gol-Pak Holdings, Inc. ("Gol-Pak"), which merged with and into Perdue. In April 2001, Perdue purchased 100% of the voting securities of De Luca, Inc. ("De Luca") Upon information and belief, each of Showell, Advantage Foods, Gol-Pak, and De Luca purchased substantial quantities of corrugated containers from one or more of the Defendants during the Relevant Period. As a result, for purposes of this Complaint, all purchases of corrugated containers by Showell, Advantage Foods, Gol-Pak, and De Luca during the Relevant Period are treated as purchases by Perdue.

## DEFENDANTS

10. Defendant Stone Container Corporation ("Stone Container") is a Delaware corporation with its principal place of business in Chicago, Illinois. During the Relevant Period, Stone Container manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States. In November 1998, a subsidiary of Defendant Jefferson Smurfit and Defendant Stone Container Corporation merged to form Defendant Smurfit-Stone Container Corporation ("SSCC").

11. Defendant Jefferson Smurfit Corp. ("Jefferson Smurfit") is a Delaware corporation with its principal place of business in St. Louis, Missouri. During the Relevant Period, Jefferson Smurfit manufactured and sold linerboard, and manufactured and corrugated containers to purchasers in the United States. In November 1998, a subsidiary of Defendant Jefferson Smurfit Corporation and Defendant Stone Container Corporation merged to form Defendant SSCC.

12. Defendant SSCC is a Delaware corporation with principal places of business in Chicago, Illinois and Clayton, Missouri. Defendant SSCC was formed in November 1998 by a merger of Defendant Stone Container and a subsidiary of Defendant Jefferson Smurfit. information and belief, Plaintiff alleges that Defendant SSCC is the successor in interest to Defendants Stone Container and Jefferson Smurfit and is liable for the actions of Defendants Jefferson Smurfit and Stone Container as alleged in this Complaint.

13. Defendant International Paper Co. ("International Paper") is a New corporation with its principal place of business in Purchase, New York. During the Relevant Period, International Paper manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States. Effective April 30, 1999, Defendant

International Paper finalized its acquisition of and merged with Defendant Union Camp Corporation ("Union Camp"). Upon information and belief, Plaintiff alleges that Defendant International Paper is the successor in interest to Defendant Union Camp and is liable for the actions of Defendant Union Camp as alleged in this Complaint.

14    Defendant Georgia-Pacific Corp. ("Georgia-Pacific") is a Georgia corporation with its principal place of business in Atlanta, Georgia. During the Relevant Period, Georgia Pacific manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States.

15    Defendant Weyerhaeuser Paper Co. ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington. During the Relevant Period, Weyerhaeuser manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States.

16.    Defendant Temple-Inland Inc. ("Temple Inland") is a Delaware corporation with its principal place of business in Diboll, Texas. During the Relevant Period, Temple Inland manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States.

17.    Defendant Gaylord Container Corp. ("Gaylord") is a Delaware corporation with its principal place of business in Deerfield, Illinois. During the Relevant Period, Gaylord manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States.

18    Defendant Union Camp is a Virginia corporation with its principal place of business in Wayne, New Jersey. During the Relevant Period, Union Camp manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United

States. Effective April 30, 1999, Defendant International Paper acquired Defendant Union Camp.

19. Defendant Simpson Tacoma Kraft Co. ("Simpson") is a Washington corporation with its principal place of business in Tacoma, Washington. During the Relevant Period, Simpson manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States.

20. Defendant Tenneco, Inc. ("Tenneco") is a Delaware corporation with its principal place of business in Greenwich, Connecticut. During the Relevant Period and through early 1999, Defendant Tenneco, through its affiliate, Defendant Tenneco Packaging, manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States. In early 1999, Defendant Tenneco spun off its corrugated packaging operations into a separate, free-standing company, Defendant Packaging Corporation of America.

21 Defendant Tenneco Packaging, Inc. ("Tenneco Packaging"), formerly known as Packaging Corporation of America, is a Delaware corporation with its principal place of business in Lake Forest, Illinois. During the Relevant Period, Tenneco Packaging manufactured and sold linerboard, and manufactured and sold corrugated containers to purchasers in the United States.

22. Defendant Packaging Corporation of America ("PCA") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Defendant PCA became a free-standing company as a result of Defendant Tenneco's 1999 spin-off of its corrugated packaging operations, Defendant Tenneco Packaging, which was formerly known as Packaging Corporation of America, and which manufactured and sold linerboard, and manufactured and

sold corrugated containers to purchasers in the United States. Upon information and belief, Plaintiff alleges that Defendant PCA is the successor in interest to Defendants Tenneco and Tenneco Packaging, and is liable for the actions of Defendants Tenneco and Tenneco Packaging as alleged in this Complaint.

Upon information and belief, various other persons, firms, corporations, and associations not named as Defendants in this lawsuit (the "co-conspirators") may have conspired with Defendants and participated as co-conspirators with Defendants in the offenses charged herein, and have performed acts and made statements in furtherance thereof.

## TRADE AND COMMERCE

24. During all or part of the Relevant Period, Defendants manufactured, sold and/or shipped corrugated containers and linerboard in a continuous and uninterrupted flow of interstate commerce. Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce.

25. The trade and interstate commerce relevant to this action is corrugated containers and linerboard. Linerboard is the principal component of corrugated containers, accounting for more than fifty percent of the production cost of corrugated containers. All of the Defendants named herein were manufacturers of linerboard and also produced corrugated containers.

26. Corrugated containers are generally viewed as interchangeable in that most manufacturers are able to supply the product needs of most customers.

## VIOLATIONS ALLEGED

Throughout the Relevant Period, Defendants and their co-conspirators engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in

linerboard in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and the Maryland Antitrust Act, Md. Code Ann., Com. Law II § 1-204.

28. This combination and conspiracy consisted of an agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to raise, stabilize and maintain at artificially high levels the prices of linerboard throughout the United States. Because linerboard is the principal component in the production cost of corrugated containers, the Defendants' conspiracy had the purpose and effect of artificially increasing prices paid by Plaintiff for corrugated containers.

29. For the purpose of forming and effectuating their combination and conspiracy, Defendants and their co-conspirators did those things which they combined and conspired to do, including, among other things, discussing, forming and implementing agreements to reduce inventories and restrict production and output of linerboard by, among other means, coordinating downtime at their respective linerboard manufacturing plants, and discussing, forming and implementing agreements to raise, stabilize and maintain prices for linerboard.

30. In the early 1990s, Defendant Stone Container was facing extensive debt and declining revenues. Many of the other major manufacturers in the linerboard industry were also experiencing difficulties during this time. Price decreases, along with increased capacity and production, had created downward pressure on prices, with available inventory outpacing demand. In this environment, rife with excess inventory, no manufacturer of linerboard was able to make a price increase stick.

31 Against this backdrop, executives of Stone Container, acting in concert with executives from their major competitors, conspired and combined to effectuate a substantial

reduction in excess inventory, which allowed for a series of price increases, unprecedented in the linerboard industry.

32. In January 1993, Stone Container unsuccessfully attempted to increase the price for all grades of linerboard by $30 per ton, to take effect the following March. As a result of this failure, which Stone Container believed to have resulted, in part, from excess inventory within the industry, Stone Container undertook to organize a concerted effort within the industry to decrease inventory levels and increase prices.

33. Stone Container devised a strategy to invite its competitors to increase the price of linerboard. As part of the strategy to implement a coordinated price increase, Stone Container planned to take downtime at its plants to reduce its production substantially, and contemporaneously to purchase substantial amounts of linerboard from competitors and to substantially reduce Stone Container's inventory. These actions were extraordinary, and not in the regular course of business for Stone Container.

34. In mid-1993, Stone Container communicated to its competitors its intention to take mill downtime and to draw down industry inventory levels, and its belief that these actions would support a price increase. The methods of communication included both public and private statements.

35. During late June and early July 1993, Stone Container conducted a telephone survey of major U.S. linerboard manufacturers, asking how much linerboard was available to purchase and at what price.

36. Senior officers of Stone Container contacted their counterparts at competing manufacturers to inform them of Stone Container's extraordinary planned downtime and linerboard purchases. In the course of these communications, Stone Container arranged and

agreed to purchase a significant volume of linerboard from each of the several competitors, rather than to meet its linerboard requirements from its own internal production. The participation of high level executives in these communications was outside the ordinary course of business. The purpose of Stone Container's communications with other Defendants and other co-conspirators was to coordinate industry-wide restrictions on output and price increases.

In response to the communications from Stone Container, the major manufacturers, including Defendants, began to take production downtime. Significantly, this downtime was taken at a time when demand in the industry was increasing.

38. Following the unprecedented industry downtime, Stone Container recognized that the stage was set to "change the direction of this industry."

39. In August 1993, Stone implemented the first of a series of price increases that took place during the Relevant Period. This price increase was joined by virtually every major manufacturer.

40. Subsequently, pursuant to their understanding, the major manufacturers, including Defendants herein, continued their pattern of taking substantial downtime and implementing price increases.

As a result, prices for linerboard and corrugated containers were artificially raised, fixed and stabilized during the Relevant Period and thereafter.

## EFFECTS

42. As a result of Defendants' combination and conspiracy, prices of linerboard were artificially increased during the Relevant Period and thereafter.

43. Because the overwhelming majority of linerboard produced in the United States is used by the manufacturers of linerboard to produce their own corrugated containers, and

because linerboard constitutes more than fifty percent of the manufacturing cost of corrugated containers, the necessary, understood and intended effect of the increase in the price of linerboard was to increase the price of corrugated containers sold by Defendants, their co-conspirators and others.

44.     Defendants' conduct was undertaken for the purpose and with the effect of raising, maintaining and stabilizing prices of both linerboard and corrugated containers and eliminating competition, in *per se* violation of Section One of the Sherman Act and of the Maryland Antitrust Act, Md. Code Ann., Com. Law II § 11-204.

## TOLLING OF STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

45     The statute of limitations in this action was suspended pursuant to 15 U.S.C § 16(i) by reason of a proceeding brought by the United States through the Federal Trade Commission against Stone Container, which action was pending at least through May 18, 1998

46     In addition, throughout the Relevant Period and thereafter, Defendants and their co-conspirators intended to and did affirmatively and fraudulently conceal their wrongful conduct and the existence of their unlawful combination and conspiracy from Plaintiff and other purchasers of corrugated containers, and intended that their communications with each other and their resulting actions be kept secret from Plaintiff and other purchasers of corrugated containers.

47     Plaintiff had no knowledge of Defendants' wrongful conduct or of any facts that might have led to the discovery thereof, until the Federal Trade Commission disclosed its complaint against Stone Container on February 25, 1998.  Plaintiff had no knowledge of the identity of Stone Container's co-conspirators involved in the combination and conspiracy

alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until after December 1998, when Stone produced documents plaintiffs in parallel proceedings. *See In re: Linerboard Antitrust Litigation*, MDL No. (E.D. Pa., consolidated Dec. 18, 1998) [hereinafter "MDL Proceedings"]. Moreover, the Defendants other than Stone Container have taken extraordinary steps to delay and prevent Plaintiff and other purhasers of corrugated containers from discovering information, and thus have further affirmatively and fraudulently concealed their wrongful conduct. These steps include the fact that Defendant Weyerhaeuser placed itself in contempt of court rather than abide by an order of a United States District Court to produce documents in response to a subpoena in the MDL Proceedings; and that, in response to another subpoena in the MDL Proceedings, Defendant International Paper informed class plaintiffs' counsel that prior to its receipt of the subpoena it had discarded the documents it had previously produced to the Federal Trade Commission. Furthermore, Plaintiff alleges on information and belief that several of the Defendants coordinated their responses to the subpoenas in the MDL Proceedings in order to limit the scope and delay the production of documents to class plaintiffs in response to the subpoenas.

48. Plaintiff could not have discovered the combination and conspiracy alleged herein or the identities of Defendant Stone Container's co-conspirators at any earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their coconspirators to avoid detection of and affirmatively conceal their combination and conspiracy.

49. Because of the foregoing, customers of Defendants, including Plaintiff, were unaware of the fact that prices of corrugated containers had been artificially raised and stabilized as a result of Defendants' wrongful conduct as alleged in this Complaint.

## COUNT I
### (Sherman Act, 15 U.S.C. § 1)

50. Plaintiff incorporates by reference Paragraphs 1 through 49 as if fully set forth herein.

51 By the conduct described above, Defendants engaged in a contract, combination, or conspiracy in restraint of trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

52. As a direct and proximate result of Defendants' unlawful conduct alleged in this Complaint, prices for corrugated containers sold by Defendants and other manufacturers were fixed and maintained at artificially high and noncompetitive levels during the Relevant Period and thereafter.

53. As a direct and proximate result of the Defendants' unlawful conduct alleged in this Complaint, Plaintiff, as a direct purchaser of Defendants' products during the Relevant Period and thereafter, was not able to purchase corrugated containers at prices determined by free and open competition, and consequently has been injured in its business and property in that, *inter alia*, Plaintiff has paid more for corrugated containers than it would have paid in a free, open and competitive market. Plaintiff cannot state at this time the precise amount of the damages it has sustained. A precise determination of damages will require discovery from the books and records of Defendants and their co-conspirators. Plaintiff alleges that the damages are substantial.

## COUNT II
### (Maryland Antitrust Act, Md. Code Ann., Com. Law II § 11-204)

54  Plaintiff incorporates by reference Paragraphs  through 53 as if fully set forth herein

55  By the conduct described above, Defendants engaged in a contract, combination, or conspiracy in restraint of trade or commerce in violation of the Maryland Antitrust Act (Md. Code Ann., Com. Law II § 11-204)

56.  As a direct and proximate result of Defendants' unlawful conduct alleged in this Complaint, prices for corrugated containers sold by Defendants and other manufacturers were fixed and maintained at artificially high and noncompetitive levels during the Relevant Period and thereafter.

57  As a direct and proximate result of the Defendants' unlawful conduct alleged in this Complaint,  Plaintiff, as a direct purchaser of Defendants' products during the Relevant Period and thereafter, was not able to purchase corrugated containers at prices determined by free and open competition, and consequently has been injured in its business and property in that, *inter alia*, Plaintiff has paid more for corrugated containers than it would have paid in a free, open and competitive market  Plaintiff cannot state at this time the precise amount of the damages it has sustained.  A precise determination of damages will require discovery from the books and records of Defendants and their co-conspirators.  Plaintiff alleges that the damages are substantial

## JURY TRIAL DEMANDED

58  Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests:

A.   That the Court adjudge and decree that Defendants engaged in an unlawful combination and conspiracy in violation of Section One of the Sherman Act and the Maryland Antitrust Act, Md. Code Ann., Com. Law II § 11-204.

B.   That the Court adjudge and decree that Defendants are jointly and severally liable for threefold the damages resulting from their conduct and that of their co-conspirators.

C.   That the Court enter judgment for Plaintiff.

D.   That the Court enter judgment against Defendants and each of them, jointly and severally, for three times the amount of damages sustained by Plaintiff as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

E.   That Defendants, their respective affiliates, successors, transferees, assignees and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be restrained from, in any manner:

1)   continuing, maintaining or renewing in any manner the contract, combination or conspiracy alleged herein, or from engaging in. any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

2)   communicating or causing to be communicated in any manner to any other person engaged in the manufacture, distribution or sale of any product that Defendants also manufacture, distribute or sell, including corrugated containers, information concerning prices or other terms or conditions of any such product, except to the extent necessary in connection with a *bona fide* sales transaction between parties to such communications.

F.  That the Court grant such other, further and different relief as may be deemed just and proper.

DATED: June 9, 2003

_____
Michael F. Brockmeyer (Fed. Bar No. 02307)
Paolo Morante (Fed. Bar No. 25287)
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland  21209-3600
410-580-3000

David H. Bamberger (Fed. Bar No. 01265)
PIPER RUDNICK LLP
1200 Nineteenth Street, NW
Washington, D.C. 20036-2412
202-861-3900

*Attorneys for Perdue Farms Incorporated*